Your Honor, the first case on the docket this morning is 2-22-0244. We bring you the marriage of Lawrence Gerber, Petitioner of Appellants, and Laura Gerber, Respondent, Appellee. Arguing on behalf of the Appellants, Mr. Christopher Reitz. Arguing on behalf of the Appellee, Mr. Eric J. Schwab. Good morning, Counsel, and I believe your clients, or I assume your clients at this point. So, Mr. White, whenever you are ready, you may proceed. Thank you. And let me just make one matter clear. We welcome the presence of your clients, but you are the speakers today, not your clients. Of course. Thank you. Understood. I may please the Court. My name is Christopher White. I represent the Petitioner and the Appellant, Lawrence Gerber. Mr. Gerber has appealed the decision of the trial court in two respects. One respecting a dissipation claim, and another respecting the valuation of two of the marital businesses that were divided in the divorce. Unnecessary questions. I'm not going to address the dissipation claim. I think it presents a fairly straightforward question for the Court to decide. Well, one of us may bring it up, but you can start where you wanted to. Thank you. I am going to address, however, the valuation of the 52 percent interest in Scholarships.com, which was part of the marital estate, and the 100 percent interest in American Student Marketing, which I will refer to as ASM, which was part of the marital estate. Counsel, I know what the papers say. I know what the documents say. But how does this run as a 52 percent business by your client? And Mrs. Gerber, too. Excuse me. How was it actually run as a 52 percent ownership? They did everything. The kids' trusts were name only to the best of this record. I don't see any money going to the kids other than those trusts to pay taxes for the entire entity. So why are we having a problem not recognizing and admitting for this record that this really isn't a 50 percent issue that had to be evaluated? Well, I would start with Judge Smith's findings and rulings, which were that only 52 percent is in the marital estate and the 48 percent interest of the trust are valid. Okay, that's the first point that I would make. And that finding is not challenged on appeal. Would you agree, Mr. White, that the general rule is that so long as a court's valuation is within a range testified to by the experts, the valuation will not be set aside or reversed on appeal? There are certainly cases that have said that and have applied it that way, and then there are other cases which have. Which cases say that that rule does not apply? Well, there is, for instance, the case of marriage of Cutler, which was cited 334, Elect 3rd, 731, which was a case where, yes, it was within the range of the expert's testimony, but the appellate court said, you know, wait a second, these valuations ignored some very fundamental facts, such as that there were various restrictions on the sale of a single-line insurance agency that did not apply to the multi-line agencies. What fundamental facts did the trial court in this case overlook? Well, the trial court correctly, in rejecting the ASM and scholarship valuations of Ms. Gerber's experts, noted very similar to the Cutler case that in that evaluator, Hillcoat, was comparing ASM and scholarships to Google and says right in the judgment, the evaluator lost all credibility with the court by making that analysis. The trial court here made detailed findings as to, factual findings, as to why he could not independently value ASM, that it was essentially one entity which your client admitted. It was rated as one entity, scholarships and ASM. Corrupt. That is not disputed on appeal, nor is the court's finding that the value of ASM is zero. That was the finding. So what is at issue is the 52 percent interest in scholarships. I come in to respond to you again, Justice Hutchinson. It is the fact that although the Gerbers were taking more than 52 percent of the distribution. That's 87 percent, I think the record indicates. I think it was 86, but I won't hold on. Okay. 86 point? Right. Even though they were taking more than their 52 percent of the distributions, they were booking what they were doing, okay? It wasn't like money under the table that they were taking. They were booking it as loans. They were booking it against the capital accounts so that their capital accounts are not negative and the trust capital accounts are positive. And Ms. Gerber herself testified in the trial court that the plan all along was to rectify these imbalances upon the sale of the companies. Now, the trial judge, when Mr. Gerber's expert did his valuation, he had something like $5 million in catch-up distributions that would be due the trust on the sale of the company. The trial judge discounted that, didn't consider it, did consider the risks of litigation possibly to be brought by the trust against Mr. and Mrs. Gerber in the company-specific risk premium that was applied by Mr. Friend, but that was a small amount. But the judge discounted that $5 million, didn't take it into account as a liability. It's not challenged on appeal by Mr. Gerber, but it is a fact. But this company or the companies have been in effect since 2004 for scholarship and I think 2005 for ASM throughout that period of time until this second divorce was filed in what, 2018? Yeah, 2017 I believe. Okay. That's a few years and there has not yet, at least not according to what I could find in the record, been any sort of litigation about how this is being handled. So why would there be a risk of litigation upon sale? Well, a couple of points. First of all, for most of that time period, the children were minors, and of course Mr. Gerber and Mrs. Gerber are the two trustees of the trust in charge of protecting the interests of the beneficiaries. And they were both aligned up until 2017 or 2018 until the divorce case was filed. And again, as I said, Mrs. Gerber testified that the plan was that they were actually supporting their children outside of the entities and she thought that that would all be taken into account. She recognizes they didn't do it the right way in determining what the children are owed. But again, she said that the time where the accounts were going to be balanced was upon the sale of the company. Now, after 2017 or 2018, of course, Mr. and Mrs. Gerber are no longer aligned in their operation of the trust. They're not only just opposed, they're probably bitterly opposed. So what will Mrs. Gerber, as co-trustee, do once the dust has settled after this litigation? That remains to be seen. But the trial judge recognized that there was a substantial litigation risk. Mr. Brennan, the court's expert, recognized that there was a substantial litigation risk. And of course the future is unknowable. But we've cited cases that say it's not the job of the trial court in valuing the companies to speculate as to how a buyer is going to operate the companies in the future. Certainly. So how did the trial judge make a mistake in discounting that? If the judge is, it's not his responsibility or her responsibility to build that into the situation. Well, I'm not saying he did make a mistake in that respect. I'm merely responding to your comment, if there hasn't been litigation against the parties in the past, why should we speculate there's going to be litigation in the future? We don't know whether it is or there isn't. What our focus is – Lawrence testified that he wants to continue to run both companies. He did. He did. And that's absolutely true. But the question is, under Section 503K, what is the fair market value of a 52% interest? And the question that we are, as we frame it on appeal, is, is it an appropriate exercise of the trial court's discretion? Is it in keeping with valuation practices? Well, the trial court, again, he valued ASM and scholarships together, the combined value. And that was in the comments section of the ledger. And, again, that is not challenged on appeal either. The enterprise value that the trial court – You argued in your brief that the trial court erred in assigning no value to ASM. Wrong. I'm sorry, that's just wrong. They argued, the appellee argued in their brief that the reason, the explanation, the justification for 52% of scholarships.com plus ASM being worth more than 52% of the enterprise value of the combined entity was due to the inherent value in ASM, which they as 100% owners, or Mr. Gerber is a 100% owner now, retained following the divorce. The trial judge's finding, fully accepted and endorsed by Mr. Gerber on appeal, is that ASM was worth zero, which completely undermines the central, the linchpin of the appellee's argument on appeal. The appellee is saying to you, wait a minute, he didn't just get 52% of scholarships.com. He got 52% of scholarships.com plus 100% of ASM. Of course it's going to be worth more than 52% of the enterprise value. Mr. Gerber is saying to you, absolutely not. The trial judge found correctly that there is no value in ASM. The most. No independent value. No, that's true. I know you keep saying this, but there is a value to it when it's combined with scholarships. So the revenues of scholarships that were shifted to ASM create value. That is correct. But we're looking at it, of course, from the perspective of a buyer in the open market. Mr. Bren testified, the trial judge agreed, that the business that was being shifted to ASM, that could have been done as a doing business as or as a division of scholarships. The buyer of the company could set up its own ASM in a heartbeat. There's no reason or need for ASM to be bought out in the open market by a buyer of scholarships.com because everything, everything at ASM is entirely derivative of scholarships. They're using scholarships.com data. They're using scholarships.com office space. They're using scholarships.com computer. The buyer doesn't need it. And Mr. Gerber is asking the court to focus on, as the fair market value standard commands, what would a buyer, under no compulsion to buy, being reasonably possessed of knowledge of the facts, pay for these companies? The trial judge said nothing for ASM. We agree. The trial judge said $7,050,000 for scholarships.com because if you take the value of the whole and you subtract the value of the trust interest, which have been discounted by over $2 million, that's what you're left with is $7,050,000 for scholarships.com, which we believe and are arguing is completely arbitrary. It's just completely arbitrary. If you're going to value 52% of scholarships.com, then just value 52% of scholarships.com. Why is it that the trust interest, which are fractional interests, get 30% and 35% discounts, which blended together is about 40%, but not only does the 52% interest not get those discounts, the 52% interest gets the 40% discounts to the trust interest, which is about $2 million, added to the value of scholarships.com? On what valuation theory could that possibly be justified? Mr. Brennan, justify it on any valuation theory? Well, we've called it the, I have it here somewhere, it deals with minority, a minority discount, taking into account the minority. You don't want them to take into account the minority? I do want them to take into account, and I think it's perfectly appropriate for a fractional interest, whether it be 48% or 52%, to receive a discount. I mean, as a practical matter, you're in the open marketplace. What you want is all of scholarships.com, right? You don't want 48% of scholarships.com. You don't want 52% of scholarships.com. Neither one of those interests gives you control of the company. Well, you know, the trial court commented that valuation of a corporation is an art, not a science, and your argument really is kind of a scientific argument. You know, you look at the figures. Stouts, valuation, $1.6 million for a total of $4,140,000. And then Laura's expert, Hillco, $9.9 million. There's a vast disparity, right? A vast disparity. I have the figures as Stout having, Larry's expert having ASM at $1.7 million, and Laura's having ASM at $6.15 million. And the trial judge said, neither one of those numbers is right. It's worth nothing. Now, obviously, I mean, I think the trial court picked up on where it's a valuation mess. Well, the mess, of course, was in, as originally testified to by the accountant, the mess was in the fact that to value these entities separately, you had to allocate some of the expenses of scholarships.com to ASM. You had to allocate a cost for data, all those things that didn't happen. That was what the mess was. But at the end of the day, the valuations on scholarships was Stout was at $2.46 million, Hillco was at $3.8 million, and the judge said $7 million. Okay. I have one. I have a question that I couldn't get to because you and Justice Burkett were talking, but now I have the opportunity. If we take your value, as you've just described to Justice Burkett, from Mr. Stout, Mr. Gerber's expert, it doesn't come close to covering the $5-plus million that is set aside for the trusts. Well, that would understand. And he went close. Yeah, true. I do understand, though, that Stout's valuation of $2.46 million was assuming that there was a $5 million. First of all, it was assuming that Mr. Gerber and Mrs. Gerber were going to repay $2 million of loans to scholarships.com, and then it was assuming that scholarships.com was going to pay catch-up distributions of, my memory is, about $5 million to the trust before the remainder is divided. So the trusts are not getting 48% of $2.46 million. They're getting $5 million plus 48%. And that's coming from where? That is, well, as a practical matter. The ASM, from the ASM account that has that set aside? Where's it coming from? Well, certainly the cash wasn't in, you know, I can't remember what the balance sheets were as of December 31, 2018, but there wasn't anywhere near that much cash in the entities. But again, remember that the valuation itself is not just the book value of the companies. The valuation is significantly more than what the book value of the companies are. It's more than just the cash in the accounts receivable minus the liabilities. It's your capitalizing the future income stream of the companies to get to that value. So where does the money come from to pay the $5 million to the trust? Well, if you sell the company for $5 million, under the Stout analysis, the first $5 million would go to the trust. And that means nothing would go, very little would go to the bearers. Correct. Now, again. And that doesn't make any sense either. Well, and the trial court didn't accept that. Remember, though, that Stout had broken it out and also had another $1.68 million in the value of ASM. So the two goes together. Which, right, the trial court said it was zero and we say it was zero. But if you're going to pull the ASM revenues back into Stout and just do a valuation of Stout, excuse me, of scholarships, because in reality they're scholarships.com's revenues, then Stout's valuation jumps to about $4 million. Still not enough. True. $4 million net of the five, $4 million for the party's 52% interest. So the whole company would be closer to like $8 million. But you don't accept Mr. Stout's analysis of ASM. So you say it's zero and he says it's $1.68. I mean, I was never good at arithmetic. Okay. But I am better than this. I can't figure out where that $5 million is coming from. And you say that's a very important part of this equation. And payment of the $2 million plus loans is a very, very important part of this equation. I don't see the money. The enterprise value that Stout came up with of the two entities combined was $6.4 million. Okay. That was what the enterprise value was. Okay. So under the Stout theory, that is what on the open market Stout would claim that a buyer would be willing to pay for these two companies for 100% interest in both. Okay. That would generate enough money to satisfy the liabilities to the trust and leave some left over. But remember, Mr. Gerber is taking the case just as you are, as we find it on appeal. Mr. Gerber is saying what is a reasonable solution consistent with the trial court's finding that the enterprise value of the company is roughly $8 million. What is a reasonable solution? That in keeping with the Grunston case allows the appellate court to do justice to all the parties, bring the case to an end without remand. The solution is to just set the value of scholarships.com not with a premium equal to the trust discounts, which is what the trial judge did, which is completely arbitrary, but just 52% of the combined enterprise value of both entities. And that's the number that is in our brief. It's roughly $5 million as the value of the party's 52% interest, roughly $2 million less, $1,955,000 less than what the trial court judged, and, not coincidentally, but the exact amount by which Mr. Brennan discounted the interest of the trust and put that discount on the value of scholarships.com, the 52% interest, we claim arbitrarily. And, Your Honor, with that outcome, Mr. Gerber brings the case to a conclusion. You know, if it gets remanded, of course, Mr. Gerber's position is going to be not only do you not add $1.9 million of premiums to the value of the 52% interest, the 52% interest wants the same discounts that the trust got. The position in the trial court will be it's not worth $5 million, the 52% interest. It's a factual interest. It's a noncontrolling interest. If you're going to discount the trust's interest by 30% and 35% for minority and lack of control, you've got to do, if not those same percentages, some percentage discount for the 52% interest because it is in almost the exact same position as the trust sought from the perspective of a buyer in the open marketplace under no compulsion to buy, having reasonable knowledge of the relevant facts. Hold on a minute. Justice McClaren, do you have any questions at this time? No, I don't. Thank you. I'm sorry, Justice McClaren. Do you need to ignore me? I just focused on the people in front of me. No problem. Mr. Weitz, generally speaking, would you agree normally attorney's fees incurred pursuant to a divorce proceedings are not considered marital expenses? Why is this case an exception? Well, now pursuant to Section 501, they're considered advances against your share of marital estate, which is essentially how dissipation claims are treated. We're not saying that there is an exception for this case. What we're saying, though, is that attorney's fees we're talking about were attorney's fees incurred before the breakdown of marriage, and they weren't fees in this divorce case, right? So it's not a Section 501 analysis because they weren't fees in this divorce case. It's not a dissipation analysis because it occurred before the breakdown of marriage. The distinguishing factor, of course, is that they were paid in Larry's case, but not in Laura's case after the breakdown of the marriage. And if we agree with you, is a remand necessary, or can we make the divorce necessary?  Because the trial judge wanted exactly a 50% division of the marital estate, so half that amount would come back to Mr. Gerber. And one other question. When Mr. Gerber challenged the Grund and Levitt, were there additional attorney's fees assessed in that lawsuit? And where did that amount of money go? Or is that not part of this record? So the record – so what is in the record is the attorney's fees that were paid to Figulio and Silverman, which were the attorneys who represented Mr. Gerber defending against the fee petition of Grund and Levitt. I, candidly, off the top of my head, I don't recall and I don't believe that there is a breakdown in the record of what portion of the payments to Figulio and Silverman were for Figulio and Silverman's services versus to satisfy the settlement with Grund and Levitt. Because that lawsuit came after the judge found that there was a breakdown. It might have started about that time, but it didn't finish until afterwards, right? I think that's a correct statement. Okay. I mean, it was – right. He was challenging a pre-breakdown debt, and what the result was was what he paid after the break. Okay. Thank you. Thank you for your time. Mr. Schwab. Good morning. I'm Eric Schwab of Berger Schatz on behalf of Laura Gerber. And you need to keep your voice up because we all need to hear it, including Justice Borner. And I heard Justice Burkett earlier reference the standing rule, which isn't a hard and fast rule, but the idea that if a trial court faced with conflicting valuations, comes to a value determination that's between the two values, I think the caveat word is ordinarily, barring some great mistake, that would not be overruled on appeal. In other words, if the trial court can put the value between the goal posts, then generally that won't be subject to reversal on review. And that even includes when the trial judge does a lot of that work his or herself. I mean, the expert is important, but trial judges have looked at these numbers and gone, well, you know, I accept this and I accept this, and they come in the middle. So that's even without an expert that it usually stands, correct? That's correct. That's correct. And in this case, we didn't just have two experts. We had three. We had two businesses, five reports, three experts, and that was the – that was the result of the mess that they all started out with. And the judge reviewed them all carefully, didn't accept any of the expert opinions entirely, although we are here before you today with the overall combined 100% enterprise value of 9.798 million, I believe, is not being challenged on appeal. So that's accepted. And what the judge did, looking at all the valuations, and at the last point when the judge looks at his own expert, Mr. Brand, how to handle this piece of this 9.798 million, which doesn't belong to the parties, which isn't in the marriage, and which wasn't resolved in the judge's eyes by these separate valuations, which were all over the map. And in the judge's detailed analyses also, so many unresolved problems of where to allocate revenues, how to allocate expenses. And so the judge came up with a very elegant solution with one combined value, and the judge uses the fair market valuation that Mr. Brand reached for this 48% interest in scholarships.com owned by the trusts. And the judge just takes the combined value and makes one cut and says, just take the part out that doesn't belong to the parties of this trust interest. Now, the trust interest to do that, it's been discounted by Mr. Brand, and the judge accepted that discounted valuation because the task was to reach a fair market value for these trusts' interests. That's what the statute requires. That's what Mr. Brand and the judge were looking to do. And Mr. Brand applied valuation discounts that he testified about, that were referenced in his report, that were standard, the discount for lack of marketability, which applies to all the shares. But then a discount as well for minority interest because a 48% interest of scholarship.com would give a hypothetical buyer no control and so no ability to control what cash flows come from the business. So we're assuming in this picture that someone who's going to walk up to the door and knock and say, I want to buy a scholarship, is going to also resolve or is going to buy the 48% too, and that's why we're discounting. We're discounting because that's really what the IMDMA requires is to reach a fair market valuation. And what IRS Revenue Ruling 5960 sets up this standard of the hypothetical willing buyer and the hypothetical willing seller. And I underscore that because we understand that that's very hypothetical, a buyer coming in and wanting to buy this 48% interest. But the other part that I alluded to in my brief with perhaps the clunky analogy of the apples was solving the problem of what is that hypothetical buyer, which I don't, it barely exists that somebody buys the, but if they're buying 48%, they want to say, well, I see scholarships and ASM in a commingled continuum. What am I getting of this business? And here's, it's important to see that in Mr. Burns' report that the judge accepted, he makes a very conservative assumption for this narrow purpose of coming to a fair market value of the trust in 48% interest in scholarship.com, which is, if you look at, I believe, it's on page 33 of Mr. Burns' report, and I don't know the citation to the record, but he starts with the top-line full enterprise value. Then he, separately from the value that we're now disputing on that top-line value of the combined entities, he applies the discounts first, the discount for lack of marketability of 31%, 35%, excuse me, a discount for minority interest of 30%. Then he adds back the non-out. He goes through the full valuation exercise to come down to this number. I'm sorry, I got ahead of myself. He applies the discounts to the top-line number. He adds back the assets. And to that number that he comes to, that's the adjusted discounted enterprise value, he multiplies that number by 48%. Now, we know that that number he's multiplying by 48% is still actually a discounted aggregate value of both enterprises. It's not just 48% of scholarships.com. So in that way, it's a conservative assumption. It assumes a bigger piece of the pie, if anything, is going to the trusts for the sake, for the sole sake of deriving their fair market value. So if that's the case, that gives the trusts a bigger fair market value for their 48% interest than they might otherwise receive if they're just being calculated based on scholarship.com, if that makes sense. That's an advantage, and that's an advantage that accrues ultimately to Mr. Gerber, even though he's challenging the full valuation. So it's important to see that they make this conservative assumption there. But it seems to be an advantage to the 48%, particularly. Well, an advantage to the 48%, but that still accrues as an advantage, I think, to the party who ultimately receives 100% control of these two businesses, subject to this 48% interest. Is that there is now on the record you have an expert-derived, court-acknowledged fair market value for that interest. And that interest then can hypothetically ñ this gets into what people will do after today in the future. But it does produce what's a fair market value so that these trusts could theoretically be bought out, be taken out of the equations. Then the person owns 100% of the combined businesses. Between 2004, 2005, and the date of the ñ when Mr. Gerber filed for divorce, is there any sort of conflict that has occurred between the 52% and the 48%? Have the kids sued? Have the kids asked for audits of the ñ anything that's gone on? There's nothing of that in the record, and there's nothing of that currently. And these aren't ñ the record does reflect that these aren't the only interests in which the children have trust interests for their parents or the trustees. And that is something that is not 100% answered by the record in front of us in terms of what will happen in the future. But what the trial court had to decide was was it going to wade in and start trying to control this aspect? And that's difficult. And, you know, trust matters are very tricky when the interests are out of the marital estate, but then the interests are governed in a fiduciary capacity by the parties. Their capacity as trustees isn't necessarily something that the trial court can impose orders on. And so that's, again, as I was talking about, the elegant solution is take this out. That has to be resolved in the future. But there isn't ñ no, to answer your question, Justice Hutchinson, there's not a record of strife or litigation so far. And as you've discussed with Mr. White, that was ñ I'll use the colloquial phrase ñ that was baked in to Mr. Brin's valuation that's been accepted here as a litigation risk. And that's a process that goes into valuation. Ultimately it becomes a percentage that gets worked into a discount rate. But in any case, that was expressly addressed in the valuations and incorporated was this ñ and that would be something that would ultimately drive down the overall price. A hypothetical investor would be willing to ñ not willing to pay as much to the extent there's some perceived potential future litigation risk. Was that concept built into, say, Mrs. Gerber's evaluation? The valuation by Hilco of the two, I don't believe it was. Hilco, in my recollection now, did not address some of these outstanding financial issues between the businesses and the trusts. And how about in Mr. Stout's initial assessment? Was that built in? In the Stout assessment, as you discussed with Mr. White, the Stout assessment ñ and addressed in this idea of a clawback provision, which Mr. Brin criticized because it's not actually contained. It's not actually a power that is within the scholarships operating agreement, but it was addressed in terms of the ñ in scholarships.com, the ability for the 48 percent interest ultimately to try to exercise a right to claw back the portion of distributions that weren't pro rata paid to the trusts. And to obtain that recovery, again, these are ñ this is where we get into the really ñ the robust meaning of the word mess in terms of the issues where the trial court said, do I have to unravel every one of these knots? Do I have to untie every one of these strings to resolve this? And I think, again, back to my solution, the trial court saw what Mr. Brin did and thought this was a chance to just cut the Gordian knot with one slice, take the trusts out. And the situation created with the trusts is ultimately a legal situation that's going to exist outside of the mayoral estate. But in Mr. Brin's analysis, Mr. Brin recognized, and the trial court accepted, that by shifting it primarily to the parties, saying, what you do is you just take these as excess distributions and work this out with your accountant, rather than trying to have an order that wades into the problem of what the trusts should do, what the parties should do as trustee when the court doesn't have ñ you're getting outside of the court's jurisdiction at that point. Do you want to address Larry's argument that payment of the legal fees was not dissipation? Well, I'd be happy to address that. And I think that the timing speaks for itself. It was after the irretrievable breakdown of the marriage. And as was discussed here earlier, it was because the earlier divorce proceeding had been resolved. So that was an existing debt before the breakdown of the marriage? Well, it was an existing debt before the breakdown of the marriage. And you point out in your brief, you know, that ñ or you argue that there's no per se rule that payment of existing marital debt cannot constitute dissipation. Correct. If we apply that, wouldn't that be unfair in this case because of Larry's payment of existing legal fees was found to be dissipation but not Laura's, just because she paid it before? Well, I think it's important to look at the fact that when ñ in assessing what is dissipation, the trial court looks at a lot of factors. And this is ultimately a finding of fact. And it's subject to the manifest weight standard. So unless the opposite is clearly true or it's clearly an error, and in this case the trial court knew and was in the record the whole history of what led to that, that amount being paid at that time for those reasons and not just being paid to the ñ it wasn't just ñ we all understand it wasn't just a debt that was kicked down the road. The trial court was ñ I think he expressed some ñ I don't know how to phrase it, but he did not like the fact that the parties had spent $6.8 million on legal fees in this case alone. Correct. And he wanted this case to end. Correct. And that was ñ I think the trial court saw that these fights were going. And if Your Honor's suggestion ñ I just don't ñ I wouldn't want to speculate because I didn't see in the record how much that would have possibly colored the trial court's assessment of other debts and other debts that were resulting not just from an earlier ñ I mean, because the trick is that if it comes to ñ He made a lot of comments about credibility of their ñ as well as Lohr's, that their testimony or their positions weren't credible in some cases. Yeah, there was a lot of that. I think that ñ I think coming to the ñ I'm trying to contextualize that. With the dissipation question is, I think one thing we could probably say for sure is that if my client as well, Mrs. Gerber, had also paid her fees from the earlier divorce after the date of the irretrievable breakdown, I think it's fairly clear those would have been dissipation as well. The trial court just has no legal power to reach fees that were paid before the date of the beginning of the irretrievable breakdown of the marriage. But I think the trial court was looking at all of these. And it ended up being a fairly easy call, saying this is clearly not for marital purpose. It's after the date of the irretrievable breakdown. This goes on Mr. Gerber's side of the balance sheet. That's how to deal with this debt, rather than saying, well, we're splitting it because this is after the breakdown of the marriage. Isn't that description that you've just offered totally inconsistent with very early on in this modification of the Marriage and Dissolution Act, leveling the playing field. These parties both had attorney's fees that came out of the first litigation that was ultimately settled, dropped, whatever it was. It's not there anymore. But they both had fees. And even though she might have paid her fees before the critical date, his fees came from that. And that was part of that leveling the playing field. So how exactly, I mean, I think it's, I personally think it's inconsistent with that concept to now say he has dissipated. So how do you address that? Well, if I can respectfully respond, because I disagree with your Honor's point. And I think the point is that I don't think that really captures the policy of leveling the playing field, which is where one side gains, has a financial advantage in the course of the dissipation, and you want to make sure that people aren't coming onto the playing field with an unfair advantage. And I was about to make a sports analogy, but I'm going to refrain. And I think that leveling the playing field is more to address economic inequality. I don't think that it carries over into the statute to say, well, everybody's amount of fees paid should be roughly the same, that it should be equalized. Because the upshot I believe you're addressing is that then in the context of this dissipation, Mr. Gerber is hit with a dissipation cost on his side of the balance sheet that wasn't on our client's balance sheet. And that's absolutely correct. But again, it's important to understand that apart from a finding of dissipation, the trial court under Section 503 has very broad discretion about what value to assign to a dissipation and how to put that on, how that fits into the overall division of the marital estate. This trial court could have just as easily said I find it to be dissipation because it's after the date of the irretrievable breakdown. The trial court had the discretion to discount that amount. The trial court's not required to go dollar for dollar, penny for penny for any dissipation finding. But that's not usually what we consider dissipation. It's much more basic than that. It's I bought a sports car because I wanted the sports car. I bought a diamond ring for my new betrothed. It's those types of things that are totally outside of the marriage. This was in a divorce case, but it was totally inside of the marriage. So I'm still having trouble. I know it's with one party comes in with less ability to defend than the other was one of the issues in leveling the playing field. But it's still we're totally, well, like the rest of this case, we're totally throwing leveling the playing field out. He can pay more, so you should pay more. And it's dissipation. I'm having trouble making sense of that. Well, and I understand the struggle, but it's the trial court heard all of the testimony about why this debt gets paid then and for what reason. And this is part of what informs the trial court's finding. And you make a good point. And I get this as a practitioner. People are putting the other side's attorney's fees onto a dissipation notice. And we know it's not technically dissipation. We're trying to move away from that. It's addressed by a different part of the statute, which just says there's a presumption that everybody is going to pay their own fees, all other things being equal, again, to not leave the leveling of the playing field. But, you know, subject to contribution claims, each side is subject to their own fees, which has the same exact effect as a dissipation finding. It just takes the dollar amount and puts it on one party's side of the balance sheet. Now, that didn't happen here. The fees were simply paid. And after the irretrievable breakdown, the court had to address what to do with these fees. And I think it's just as equitable to say attorneys' fees being paid in this divorce, after the irretrievable breakdown, when the sharing has broken down, is you put those fees on that side of the balance sheet. And I'm trying to formulate this in as high a way as I can without going into the specifics because I just didn't — I'm not familiar enough for the record that I'm going to jump out and try to speculate about what other things might have influenced the court's decision. But I think the court had something that's on its face, fits the definition of dissipation. And so the court is saying what equitable principle gravitates against it to take this out? And if that's the case, what other things can a spouse do? What other debts carried in? Is there some way to — does that invite its own type of financial engineering? I don't know. It was fairly unique reading up on this on the statute, but I come back to the fact that certainly it's a bullseye in terms of the definition of a payment for a non-marital purpose that's made after the marriage has begun its process of irretrievable breakdown. And so in that case, it's tough to say how, under a manifest rate standard, one could say that the opposite conclusion was clearly apparent and that's the only way to go. If the opposite conclusion says, well, don't take the definition of dissipation at its word. Okay. Justice McLaren, do you have anything of Mr. Schwab? Yes, I do. Sir, have you ever heard of the term accounts payable? Yes, Judge. How does that fit into your argument that the payment after a certain date, even though it may have been in the accounts payable, is dissipation? That gets to the unique quality of this predicament. Certainly it is an account payable, but in this case, I think what any court would do and what this court did was they're going to wade into those accounts payable and say, well, let's look at each of these invoices and what's being paid and for what reason. And one of the questions that I think is worth asking is why is it in the accounts payable ledger when we have one party didn't have that problem because it got paid, it got timely paid. We have another party that didn't make the timely payment. We know that the timely payment was related to an ongoing dispute. The payment was disputed. There was more litigation. I think that that very fact that there was litigation around that unpaid piece of AR that was still left over, again, my understanding is this is something the trial court would have had to take into account in seeing, and as you mentioned earlier, oh, my heavens, this litigation, every rock I look under, I see more litigation. And in this case, the court said, well, this piece of the litigation got paid after the irretrievable breakdown, and that meets the definition of dissipation. Did any of the trust beneficiaries attempt to intervene in this case? No, Judge. Did any of the parties suggest intervention or joinder of the trust beneficiaries? I'm not aware of any such effort, Judge. Did any of the experts confer or talk to, converse, communicate with any of the trust beneficiaries, to your knowledge? To my knowledge, no. I'm intrigued, and I want to go back and look at my reports again, but I don't believe so. Would it be safe to say that the judgment in this case has no legal effect on the trust beneficiaries insofar as a declaration of what their rights, duties, responsibilities, privileges, et cetera, are? I believe that is correct, yes, Judge. Justice Breyer. The husband's counsel suggested that there were certain things that his client felt were obligations that he may have had to the trust beneficiaries that were supposed to take place in the future. Did I understand that correctly? I believe, if I'm understanding that correctly, that's that there were these unresolved issues. The trial court's judgment resolved the issue of the $2.2 million in shareholder loans that were taken by saying these are going to be re-characterized as distributions. But there was this, I guess the best way to call it would be an incorrect claim based on the disparity of the distributions on a pro rata basis that was out there and unresolved. Is that what you mean, Justice McClary? What was the reconciliation between the legal aspect or construction of the ownership of the trust vis-a-vis the way the trust or the business was actually handled? And apparently the trust beneficiaries have not received any income. Am I correct about that? In principle, that's correct, Justice McClary. In practice, there was actually, there were distributions, my understanding from the record, there were distributions made all along from scholarships for the benefit of the trusts for their taxes. Because they, you know, as an S-corp, it passes right through. So each of the four trusts had a tax burden relative to the declared taxable income of scholarships.com. So there were some distributions. The record was clear and the parties testified that in their mind they made ample funds available in other ways to their children, but it was not done through the K-1s, as far as the K-1s correctly reflecting the actual distributions to the trusts. So that is a reference incorrect claim. Now, procedurally that claim would be initially a claim that would be brought by the trustees against scholarships.com, saying you didn't give us our full pro rata distributions. A secondary litigation potential, I think this is addressed in the reports, would be whether the beneficiaries want to take an action against the trustees for breach of fiduciary duty. And all of that's now in the realm of the future and speculation. I think it's, as your earlier questions have indicated, there's been nothing of the sort thus far. And at a certain point I think that the trial court was seeking a solution that didn't risk pulling that conflict into the divorce and making that some basis for yet further proceedings and litigation. But that is out there in this case. So they paid the taxes on distributions of income that weren't made? Is that what I understand you just said? That's partially the way it works. Well, as S-Corp owners, they pay the taxes on all of the net income of the business pro rata. Now, whether any of that income is distributed is a separate determination usually made by the board of directors in conjunction with the shareholders. So distributions of my questions. Thank you. I have no further questions. Thank you, Justice. Thank you very much, Mr. Schwab. Thank you very much. Thank you.  And, Mr. White, if you want to, this is your opportunity to reply. Well, I want to address some of the comments. Maybe you should get closer to the microphone. I'm sorry. I think the comment about accounts payable for the dissipation claim is spot on. If Mr. Gerber had not paid the attorney's fees during the divorce case and it was sitting on the balance sheet as a debt that he has at the time of the divorce, it would have been not dissipation because it was a debt that was incurred prior to the breakdown of the marriage, and it would have factored into the 50-50 division of the marital estate, and half of that debt would have been, in effect, reimbursed to him out of Ms. Gerber's share of the assets. So it's somewhat arbitrary that he doesn't get that benefit just because he actually satisfied a debt that had been incurred. Well, he could have waited until after the divorce was over, then it would have been just paying his own debt. Well, that's another way to handle it. Well, right. And had he done that, then at the time of the divorce, there would have been this debt on the balance sheet, this $87,000 debt, which reduces his assets, and if the judge is getting to a 50-50 division, she's got to reimburse him half of that amount. I also want to address the comment about how this was treated. Mr. Schraub is absolutely correct. The trusts were getting taxed on their pro rata share of the income, whether or not it was being distributed to him, to them. But what was happening in the way that this was being booked, the obligations or the rights of the trusts vis-a-vis the Gerbers, were when you get distributions, your capital account balance goes down. If you don't get distributions and income comes in, your capital account balance goes up. So what was the situation as of December 31 of 2018? It was that each of the trusts, four trusts, had approximately $800 and some thousand as their capital account balances, and the Gerbers, their capital account balances were roughly zero, plus on the books was a $2.2 million debt owed by the Gerbers back to the company, which if that debt was then going to be, if it was repaid and that money was then going to get distributed, would go 48% to the trusts. So all that's still on the books. That's the mess that's been left to Mr. Gerber. To the comment that, well, isn't this between the goalposts? It is between the goalposts. Not only is it between the goalposts, it's right down the center. I mean, if you look at what the valuation was placed on the parties' interests in these two entities combined, or you look at the enterprise value, it's right down the middle. Now, why is that unfair? Well, first of all, what it's indicative of is that although Judge Smith did a yeoman's job of going through the separate experts' valuations, the Stout and the Hilco valuations, ultimately he didn't rely on either of them in the slightest. He did not even rely on what Mr. Brenn determined was the fair market value of the company because Mr. Brenn said, eh, Larry owns and Laura own 100% of both. It's $9.790 million. It was just this alternate calculation that Brenn had in one section of his report on distributions that Judge Smith seized upon and adopted wholesale, wholesale, right down to the penny in determining what the value is of the parties' interests. That's at page 33 of Brenn's report. Is that the discount that he applied? Yes. That's where he says, okay, I'm going to allow this discount to the trust's interest, and I'm going to take the value of the party's interest as the difference between the whole and that discounted interest. And Mr. Gerber is saying to you on appeal, hey, wait a minute. You took a $2 million discount that you gave to the trust, and you put it over on my side and added it to the value of my 52% interest. And so mine is at least $2 million too high. And if you gave me discounts because I also had a fractional interest, it's more than $2 million too high. And what is the justification for this simple arithmetic calculation? Other than that, it gets you right between the goal posts. Okay? And we're asking the court to make a determination as to whether that is arbitrary. Now, as a practical matter, and this is, of course, not the way that the statute instructs it to be done, but it is certainly true, as the trial court found, that the most likely way of realizing the value of ASM and scholarships.com is for all of the assets of scholarships.com to be sold, 100% sales. Now, what would happen if that was the case? Well, what would happen is that it would be all of scholarships.com because scholarships.com owns the data that the buyer wants to buy and all the equipment and the office space and the employees. So that's what they're buying. What would happen? According to Bren, $9.798 million would be paid. Is that challenge unappealed? No. That's agreed. It would get divided 52% to the 52% interest and 48% to the trust interest, assuming that none of these other issues with capital account imbalances get taken into account in that determination. But at the very least, the most that the Gerber's are getting for their 52% interest is 52% of $9.798 million, and that is the figure that Mr. Gerber is asking this course to accept and make that adjustment to the balance sheet with a 50% reimbursement from Ms. Gerber because the trial judge intended a 50-50 division, and that avoids the necessity of remand. That's not what the statute says is supposed to happen. What the statute says is supposed to happen is you're not supposed to assume a sale of 100% of the company. You're only valuing 52% of scholarships.com and 100% of ASM. So if we know that 100% of ASM is going to command nothing on the open market, the question before the court is, and the question that the statute required Judge Smith to decide, is what value does 52% of a company command on the open market? Now, we're not saying... And basically he's saying nothing because with that 48% tagging along, it's just not going to get much value. Which is the same as, and I'll put that on his head, the 48% interest, if you're going to value that, which is what Judge Brand did in this calculation, that's not going to command much either, right? Because who wants 48? The difference between only 48% or only 52% is negligible. And that's why Brand says, well, if you want to sell 48 on the open market, you've got to discount it heavily. You've got to discount it by 40%, roughly, if you take the 30 and 35% discounts. And we say, okay, if that's the case, fine, but how do you then avoid making the same analysis for the 52% interest? How do you avoid saying that for the 52% interest, why wouldn't they also be, maybe it's not the exact same discounts? No, it's not going to be. Maybe, but remember, Justice Hutchinson, 52% is not controlled. 60% under the operating agreement is controlled. They controlled, or Mr. Larry and Laura controlled everything. Agreed on 100%. And they made no shareholder distributions other than to pay taxes. That's true, yes. I don't think it's exactly true, but I think the other distributions were negligible in the grand scheme of things. But again, asking Your Honor, focus not on how the Gerbers control this entity. The statute requires you to focus on what the willing buyer in the open marketplace would pay for this entity. If the buyer is buying 52%, what the buyer is buying, among other things, is the pleasure of dealing with Larry and Laura Gerber as the trustees of the 48% interest that are not being purchased, right? So it's a discounted value that they're going to pay for the 52% interest. And I'll say it one last time. Mr. Gerber isn't even asking for that discount from Your Honors. Mr. Gerber is just saying 52% of $9.798 million is an acceptable result. It's a result that this Court can get to pursuant to Grunston without the need to have a remand and add on to the $6.8 million in legal fees that they've already spent on this case and bring this case to a closure. But the existing arrangement to Mr. Gerber is intolerable because it's making them pay something for a premium just because of the math of giving a discount to the remaining interest. Justice McClaren? You turned yourself off, but I saw your head shake, so thank you. No questions. Thank you. All right. Thank you. All right, counsel, thank you for your arguments this morning. We will take this matter under advisement and get out our calculators, if that's what's required. And we will now stand in recess to prepare for our next case. Thank you.